UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

THE INDIGO ROOM, INC., RAIMOND
AULEN, and DYLAN JONES,

        Plaintiffs,

v.                                 Case No:  2:12-cv-39-FtM-38UAM

CITY OF FORT MYERS, DOUGLAS
BAKER and ALAIN GAGNON,

        Defendants.

_____/

**ORDER[1]**

    This matter comes before the Court on Defendant, Fort Myers Police Officer Alain Gagnon's Amended Rule 56 Dispositive Verified Motion for Summary Judgment (Doc. #70) filed on September 5, 2013.  Plaintiffs' Memorandum of Law in Opposition to Defendant Alain Gagnon's Amended Motion for Summary Judgment (Doc. #81) was filed on September 29, 2013.  Plaintiffs filed a cross motion for partial summary judgment against Defendant Gagnon as to Count 10 (Doc. #87) on October 14, 2013 and Defendant Gagnon filed a response in opposition (Doc. #94) on November 4, 2013.

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

Also before the Court is Defendants City of Fort Myers and Chief Douglas Baker's Amended Motion for Summary Judgment as to Counts Five Through Seven (Doc. #86) filed on October 14, 2013.  Plaintiffs' Memorandum of Law in Opposition to Defendants' City of Fort Myers' and Chief Douglas Baker's Amended Motion for Summary Judgment (Doc. #96) was filed on November 11, 2013, and City's and Chief Douglas Baker's Reply to Plaintiffs' Response to Defendants' Amended Motion for Partial Summary Judgment (Doc. #100) was filed on November 27, 2013.  Finally, before the Court is Defendant, Fort Myers Police Officer Alain Gagnon's Amended Motion for Attorney's Fees and Costs (Doc. #71) filed on September 5, 2013, to which Plaintiffs filed a Response in Opposition (Doc. #84) on October 2, 2013.   All of these Motions are now ripe for the Court's consideration.

## BACKGROUND

On January 24, 2012, Plaintiffs the Indigo Room, Inc., Raimond Aulen, who is the owner of the Indigo Room, and Dylan Jones filed this 42 U.S.C. § 1983 action against the Defendants for alleged ongoing and threatened violation of their First, Fourth, and Fourteenth Amendment rights.  (Doc. #1).  Plaintiffs' Complaint lists ten causes of action and seeks declaratory relief, injunctive relief, and compensatory damages.  According to the Complaint, the Indigo Room is a licensed establishment that serves food and alcohol. (Doc. #1, ¶4).  Periodically, the Indigo Room is used to host political events and activities. Id. ¶4.  On November 17, 2011, the Indigo Room hosted a petition drive allowing citizens to sign a petition regarding a request for an ethics investigation of the Mayor for the City of Fort Myers.  Id. ¶15.  During the petition drive, Plaintiff Dylan Jones, who was 19-years old at the time, entered the Indigo Room to sign the petition.  Id. ¶¶11(c), 13.  After Jones

exited the Indigo Room, Defendant Fort Myers Police Officer Alain Gagnon issued a citation to both Jones and Aulen for violation of Fort Myers, Fla., Code § 6-83 (the "Ordinance").  Id. ¶¶17, 18.  The Ordinance prohibits persons under the age of 21 from entering or remaining in any alcoholic beverage establishment.  Fort Myers, Fla., Code § 6-83.  The prohibition does not apply to: (1) persons employed at the alcoholic beverage establishment; (2) persons accompanied by a parent; (3) persons in a bona fide restaurant; (4) persons in an establishment with an SRX or special restaurant license issued by the state; (5) or an alcoholic beverage establishment during any time period in which it is not serving or selling alcoholic beverages to the public.  Id.

On February 15, 2012, Plaintiffs sought a permanent injunction (Doc. #11) to enjoin Defendant City of Fort Myers, its officers, employees and agents, from enforcing the Ordinance and imposing additional criminal penalties on Plaintiffs based on violations of the Ordinance. (Doc. #11 at 2).  This Court found that Plaintiffs failed to show a likelihood of success on the merits as to any of their claims in Counts One through Four. [2]  (Doc. #28).  Plaintiff appealed this Court's Order to the United States Court of Appeals for the Eleventh Circuit, while the case was ongoing in this Court.  The Eleventh Circuit affirmed this Court's Order denying preliminary injunctive relief with respect to Counts One through Four only.  Indigo Room, Inc. v. City of Fort Myers, 710 F.3d 1294 (11th Cir. 2013).  This Court subsequently granted summary judgment in favor of the City with respect to Counts One through Four of the Complaint as its entry was not opposed by the Plaintiffs. (Doc.

---

[2] Plaintiffs moved for a preliminary injunction with respect to Counts One through Four only and were the only Counts addressed in this Court's Order regarding the preliminary injunction.  See Doc. #11.

#85).  Thus, the instant Motions for Summary Judgment address Counts Five through Ten of the Complaint.

In Counts Five and Six, Aulen and Jones allege First Amendment retaliation claims against the City and Chief Baker.  In Count Seven, Aulen and the Indigo Room allege violations of the Fourth Amendment against Chief Baker in his individual capacity.  In Count Eight, all Plaintiffs allege First Amendment viewpoint discrimination against Officer Gagnon in his individual capacity.  In Count Nine, Aulen and Jones allege First Amendment retaliation against Gagnon in his individual capacity.  In Count Ten, Aulen and the Indigo Room allege Fourth Amendment unlawful search against Gagnon in his individual capacity.

## STANDARD

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An issue is genuine if there is sufficient evidence such that a reasonable jury could return a verdict for either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 U.S. 2505, 91 L. Ed. 2d 202 (1986).  Similarly, an issue is material if it may affect the outcome of the suit under governing law.  Id.

The moving party bears the burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  In deciding whether the moving party has met this initial burden, the Court must review the record and all reasonable inferences drawn from the record in the light most favorable to the non-moving party.  Whatley v. CNA Ins. Co., 189 F.3d 1310, 1313 (11th Cir. 1999).  Once the Court determines that the moving party has met its burden,

the burden shifts and the non-moving party must present specific facts showing that there is a genuine issue for trial that precludes summary judgment.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissible at trial." Demyan v. Sun Life Assurance Co. of Canada, 148 F. Supp. 2d 1316, 1320 (S.D. Fla. 2001) (citing Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991)).  Failure to show sufficient evidence of any essential element is fatal to the claim and the Court should grant the summary judgment.  Celotex, 477 U.S. at 322-23.  Conversely, if reasonable minds could find a genuine issue of material fact then summary judgment should be denied.  Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1532 (11th Cir. 1992).  "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

## FACTS

The Court finds the following undisputed summary judgment facts:  Plaintiff Raimond Aulen owns the Indigo Room, a commercial food and alcohol serving establishment in Downtown Fort Myers.  (Doc. #11-1, ¶¶2-3).  Aulen opened the Indigo Room in 1996 and became politically active in the City shortly thereafter.  (Doc. #86-2, 13:20-14:1; 54:17-22; 57:8-58:3).  Through the years, Aulen's political activity has included involvement in City politics, attending City Council meetings, meetings with Council members and the Mayor, and being generally involved with the politics and events in the City.  Id. at 54:23-55:6.  In addition, prior to the fall of 2011, Aulen was active

with the Brick Street Restoration Project in the City and became involved in the preservation of the Hall of 50 States building in Downtown Fort Myers.  Id. at 57:8-23; 68:13-70:8.

In September 2011, Aulen became involved with two groups known as Wake Up Fort Myers and Finding a Better Way for Lee County, worked towards the passage of an anti-discrimination amendment to the City's charter, and held political activities at the Indigo Room including voter registration drives.  Id. at 58:4-59:9.  These voter registration drives were held on a weekly basis from September 2011 until the November 2011 election.  Id. at 67:24-68:5.  In addition, around this time, Aulen gave an interview on the local television news in which he discussed an alleged conflict of interest related to the Mayor and the City's planned water retention project.  Id. at 77:16-78:6.  As part of Plaintiff Aulen's social awareness campaign, Plaintiff Aulen sent an email to concerned citizens, claiming the Fort Myers Police Department was ineffective and unresponsive in certain respects.  Embedded in the email and placed on the Wake Up Fort Myers website and Youtube pages, was a video of FMPD activity.  (Doc. #81-7).  The email was forwarded by individuals in City Government.  (Doc. #81-8).

Aulen contends that these political activities form the basis for his retaliation claims.  Aulen claims that the Indigo Room has received increased visits, inspections, and citations from the City's Code Enforcement Division, Fire Department, and Police Department since he increased his political activity in September 2011.   Aulen has testified that despite the alleged retaliation by the City, he has not stopped his political activity since the fall of 2011.  (Doc. #86-2, 127:22-24.

Plaintiff Dylan Jones was a member of the Occupy Fort Myers movement in November 2011.[3]  On November 17, 2011, Jones, who was 19-years old at the time, and several other individuals who were members of Occupy Fort Myers went to the Indigo Room to sign a petition.  (Doc. #86-1 (Jones Depo. at 8:5-11; 8:24-9:7)).  Jones, who was wearing a t-shirt with "Occupy Fort Myers" printed on it, entered the Indigo Room, signed a petition, and then left.  Id. at 24:3-13; 38:15-16.  He testified that there were political banners at the entrance to the Indigo Room.  Id. at 38:16; 56:5-6.  Upon exiting, Jones and his group were approached by two police officers – later known as Alain Gagnon and Matthew Najar – who asked them for identification.  Id. at 24:19-25:10.  Officer Gagnon testified that they came to be present at the Indigo Room that day on standard bike patrol.  (Doc. #86-4, 54:6-9).  When asked why they needed identification, the officers responded that people coming out of the Indigo Room looked like they were under 21.  (Doc. #86-1, 54:15-21.  Jones then admitted to the officers that he was under 21 and received a citation for violating the Ordinance[4] by entering an alcoholic beverage establishment.  Id. at 19:2-6; 28:3-6; 29:22-30:8; 31:3-11; 39:1-2; 54:17-21.  The other individuals with Jones were all over 21 and were not cited by the officers.  Id. at 28:3-6; 31:8-11; 38:20-39:5 ("I got [a citation] because I was underage, obviously, but I didn't go in there and drink.").  Defendant Aulen received a citation as well.

---

[3] According to the Complaint filed by Occupy Fort Myers in Occupy Fort Myers v. City of Fort Myers, No. 2:11-cv-608-JES-DNF, Occupy Fort Myers is an unincorporated association of individuals who gathered in Fort Myers, Florida, "to bring visibility to the influence of private money into the nation's political process." (Doc. #1, ¶4).

[4] The Ordinance prohibits, with certain exceptions, persons under 21 years of age from entering or remaining in an alcoholic beverage establishment such as the Indigo Room.  Fort Myers, Fla., Code § 6-83.

The encounter took less than five minutes. Id. at 61:24-62:2. Jones testified that, "The way he [the officer] approached the situation, he approached it the right way." Id. at 59:20-21. Jones believes it was wrong for the officer to cite him for entering the Indigo Room because he was not going in there to drink and was only there for a short amount of time. Id. at 16:16-21. Jones first became involved in Occupy Fort Myers only a few days prior to the incident and had no prior interaction with the Police Department. Id. at 33:6-22. In fact, Jones had only arrived in Fort Myers a week earlier on a Greyhound bus, and had never been to the City before. Id. at 33:22-23; 34:9-13. Prior to going to the Indigo Room on that date, he had not told anyone employed by the City or the Police Department that he was going to the Indigo Room on that date and at that time. Id. at 23:5-12. Jones acknowledges that this case is premised on being detained for five minutes, which he says interfered with his right to assemble. Id. at 63:19-22. He acknowledged that his right to assemble had already expired when he was cited, as he had already left the Indigo Room. Id. at 63:23-64:1.

The evidence regarding visits, inspections, and citations from the City's Code Enforcement Division, Fire Department, and Police Department is as follows: From 1996 when Aulen began operating the Indigo Room, through September 2013, there have been 61 Code Enforcement cases related to the Indigo Room. (Doc. #86-7 (Titmuss Aff. ¶3)). Of these 61 cases, 56 of the cases were opened prior to August 2011. Id. ¶4. There have been five Code Enforcement cases related to the Indigo Room since August 2011 and these five cases were opened between February 13, 2012 and October 19, 2012. Id. ¶5. This chart shows the number of Code Enforcement cases involving the Indigo Room on an annual basis from 1996 through 2013. Id. ¶3.

| Year | 96 | 97 | 98 | 99 | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 |
|------|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| Cases | 4 | 2 | 5 | 0 | 8 | 6 | 4 | 0 | 9 | 4 | 1 | 1 | 4 | 4 | 4 | 0 | 5 | 0 |

There are five ways in which a Code Enforcement case gets opened – self-initiated activity, a complaint, a referral from another division or department, or through the City's citizen response system.  (Doc. #86-6 (Titmuss Depo. at 28:3-14)).  Code Enforcement activity is a complaint-driven process and not one in which the Division makes decisions regarding what properties to inspect.  Id. at 41:6-42:8.  Michael Titmuss, the City's Chief Code Enforcement Manager, has never been asked by any City elected official or the City Manager to conduct or have one of his employees conduct an administrative inspection at the Indigo Room.  Id. at 8:4-6; 54:1-9. Titmuss also has confirmed that the Code Enforcement Division has not taken any action against or with respect to Aulen related to or because of his political activity since September 2011.  (Doc. #86-7, ¶10).  Nor has the Code Enforcement Division taken any action against or with respect to the Indigo Room related to or because of any political activity engaged in by Aulen that occurred at the Indigo Room.  Id. ¶11.

The Fire Department conducts annual inspections of commercial establishments in the City on a random basis.  (Doc. #86-8 (Campbell Aff. ¶3)).  Not every establishment is inspected every year.  Id.  In addition, the Fire Department conducts Occupant Load Enforcements of establishments on a random basis every year.  Id. ¶4.  Not every establishment is included in these every year.  Id.  Reviewing the last five years, there was an annual Fire Department inspection of the Indigo Room on January 22, 2009, which resulted in several findings of violations by the Indigo Room.  Id. ¶5.  There was follow-up related to this inspection and those violations in 2009 and 2010, including an

inspection completed in May 2010.  Id.  Thus, in the two years before Aulen contends the retaliation against him by the City began, his establishment was inspected twice and violations were found.

There were no annual Fire Department inspections of the Indigo Room in 2011 or 2012.  Id. ¶6.  On September 1, 2012, there was an Occupant Load Enforcement of approximately 20 establishments in the City, which included the Indigo Room.  Id. ¶8.  It was noted that the Indigo Room did not have a counting device at the door and the Indigo Room was advised that it needed to be counting for accurate head count.  Id.  Otherwise there were no findings against the Indigo Room.  Id.  There was an annual Fire Department inspection of the Indigo Room on January 30, 2013, which resulted in several findings of violations by the Indigo Room.  Id. ¶9.  There was follow up related to that inspection later in 2013.  Id.  On February 15, 2013 and August 3, 2013, there were Occupant Load Enforcements of approximately a dozen establishments in the City, which included the Indigo Room.  Id. ¶¶10-11.  These resulted in no findings against the Indigo Room.  Id.  These are the only inspections conducted by the Fire Department at the Indigo Room from 2009 through to the present.  Id. ¶12.

Since Jennifer Campbell became the Fire Marshal in December 2011, the Fire Department has not taken any action against or with respect to Aulen related to or because of his political activity.  Id. ¶23.  Nor has the Fire Department taken any action against or with respect to the Indigo Room related to or because of any political activity engaged in by Aulen or any political activity that occurred at the Indigo Room.  Id. ¶24.

In 2011, the Police Department issued 37 total citations for violations of the Ordinance. (Doc. #86-10, ¶11).[5] Six of these citations were issued to Aulen and one was issued to Jones. Id. Of the six citations issued to Aulen, five of them were issued on September 28, 2011 and one was issued on November 17, 2011. Id. ¶12. By comparison, in 2011, the Cachet Bar & Grill received six citations, Club Romance received five citations, and Club Level received five citations, with a number of other establishments receiving the balance of the citations. Id. ¶13.

In 2012, the Police Department issued 21 citations for violations of the Ordinance. Id. ¶14. Six of these citations were issued to Aulen. Id. Aulen received four citations on January 12, 2012, one citation on April 26, 2012, and one citation on December 1, 2012. Id. ¶15. In addition, four individuals at the Indigo Room who were under 21 received citations on January 7, 2012.[6] Id. By comparison, Club Romance received three citations, Tubby's Bar received two citations, and Club Level also received two citations. Id. ¶17. In 2013, the Police Department issued two citations for violations of the Ordinance. Id. ¶18. Neither Aulen nor the Indigo Room received any citations in 2013. Id. Officer Eads Affidavit and attachments document the citations and the operational plans for inspections and searches of numerous Downtown establishments, including the Indigo Room.

---

[5] These citations and operational plans regarding inspections and searches are discussed in and attached to the Affidavit of Captain Dennis Eads of the Fort Myers Police Department. (Doc. #86-10).

[6] These documents reflect only planned operations performed by the Police Department. (Doc. #86-10 (Eads Aff. ¶8)). They do not reflect all inspections conducted by the Police Department at all of the various establishments in the City. Id. The City does not maintain records that would reflect all such inspections since some inspections occur separate and apart from planned operations and would not be documented in writing unless violations are found and citations are issued. Id. However, Officer Gagnon did testify at his deposition as to his recollection of administrative searches and other visits he made to the Indigo Room that were not documented, which will be discussed in this Order.

From 2002, when the Underage Persons Ordinance went into effect, until September 2011, Aulen admits that the Indigo Room did not allow 18 to 20 year olds to enter the Indigo Room.  (Doc. #86-2, 52:20-53:1; 53:13-24)).  In the fall of 2011, however, Aulen made the determination that the Indigo Room qualified as a "bona fide restaurant" under the Ordinance and that he could admit patrons between the ages of 18 and 20 because he added a dessert to his menu.[7]  Id. at 45:10-46:9; 47:9-22.   Based on this, Aulen had an "18 and up event" at the Indigo Room on three consecutive Tuesdays in September 2011.  Id. at 44:9-20.  At these events, for the first time since the Ordinance was adopted in 2002, Aulen and the Indigo Room invited individuals between the ages of 18 and 20 to enter the Indigo Room and served alcohol to patrons who were over 21.  Id. at 44:21-45:2.

After Aulen and the Indigo Room had the second of these "18 and up events," Officer Gagnon brought copies of the Ordinance to Aulen and told him that he was not allowed under the Ordinance to admit individuals under the age of 21 and warned him that if he did it again he would be cited for violating the Ordinance. Id. at 48:16-49:3; 49:22-50:13; (Doc. #86-14 (E-Mail from Officer Gagnon) (documenting these facts)). Despite this, Aulen and the Indigo Room had the same "18 and up event" on the following Tuesday, September 27, 2011.  (Doc. #86-2 at 49:4-6).  The Police Department came to the Indigo Room that night and wrote five citations to Aulen for violating the Ordinance. Id. at 49:7-13; 50:14-20; Doc. #86-15 (E-Mail from Officer Gagnon) (documenting these

---

[7] A "bona fide restaurant" is a food service establishment that derives at least 51 percent of its gross revenue from the sale of food and nonalcoholic beverages."  Fort Myers, Fla., Code § 6-1.

facts).[8]   These citations to Aulen account for five of the six citations issued to Aulen in 2011. Aulen received the other citation on November 17, 2011, after Jones entered the Indigo Room and received his citation.  (Doc. #86-10 (Eads Aff. ¶12)).

Officer Gagnon testified that he was not aware at that time that Aulen was the proponent of the new political group called Wake Up Fort Myers, that there was a voter registration drive occurring in the Indigo Room in September 2011, and he was not aware that in October 2011, events supporting the Occupy Fort Myers movement were occurring at the Indigo Room.  (Doc. #86-4, 26:9-27:10).  He also did not know that in November 2011, a petition drive had begun at the Indigo Room to investigate the Mayor of Fort Myers for unethical activity.  Id. at 27:17-20.  The evidence does show that Defendant Gagnon viewed at least one of Plaintiff's Youtube videos and then sent an email dated October 6, 2011, asking his supervisor if legal civil action could be taken against Plaintiff. Defendant Gagnon stated "[t]his libelous statement is directed toward me personally . . . There are civil laws prohibiting such defamation.  Do you think our city legal department should look into this matter and serve Aulen with a letter or possibly take civil action against Aulen?"  (Doc. #81-1).  On and around September 25, 2011, Defendant Gagnon sent emails to the City Code Enforcement and Fire Prevention Departments seeking information on Plaintiff Aulen's licenses, wherein he expressed concern that Aulen was allowing minors into his establishment, claiming it is a "bona fide restaurant." (Doc. #81-9).  This email chain also requests information regarding other Downtown establishment

---

[8] Aulen went to court and challenged the five citations that he received on this third "18 and up event," pled not guilty, and took the position that the Indigo Room met the bona fide restaurant exception. The State Court found him guilty of violating the Ordinance after Aulen could not establish what percentage of his gross revenue was derived from the sale of food and nonalcoholic beverages.  (Doc. #86-2, 51:17-52:19); (Doc. #86-12 (Certified Copies of Orders/Commitment Forms)).

licenses.  Further, in an email dated September 25, 2011, Defendant Gagnon was sent an email by a supervisor informing him of Plaintiff's political activity, Wake Up Fort Myers and the Human Rights Charter Amendment ballot initiative.[9]  (Doc. #81-11).

Aulen testified that he believes all citations he received from the City of Fort Myers since September 2011 have been in retaliation for his First Amendment protected activity. (Doc. #86-2, 18:12-16, 22:14-19).  Prior to this time, he testified that there was only occasional police presence in his establishment, once every two to three years.  Id. at 32:8-14; 98:16-19.[10]

Officer Gagnon testified that he believes he conducted an administrative search of the Indigo Room approximately a dozen times between 2008 and 2011.  (Doc. #86-4, 20:16-21).[11]  And from September 2011 to the time of his deposition in 2013, he had probably conducted ten administrative searches of the Indigo Room to detect the possible violation of the City's underage person's ordinance.  Id. at 40:9-14.  There are no departmental guidelines that determine the frequency of those administrative inspections. Id. at 32:17-20.  The inspections usually take less than an hour.  Id. at 35:13-15.  Following Aulen's "18 and up events" in the fall of 2011, the Police Department continued to inspect

---

[9] Gagnon was not asked about the email – or any of the documents submitted by Plaintiffs in support of their motion for summary judgment (Doc. #81) – at his deposition.  Therefore, it is not clear from the record whether he even read this particular email or remembered it.

[10] Aulen testified later though that from the late 1990s or early 2000s, the City ticketed him "repeatedly, repeatedly, repeatedly, repeatedly" because he was outspoken about City policies and the decisions that the City Council were making.  (Doc. #86-2, 83:12-23).  "And it was the same exact thing as I'm dealing with now."  Id.

[11] In total, Officer Gagnon estimated that he has been to the Indigo Room on official business "probably a hundred times" from 2002 to the present.  (Doc. #86-4, 37:20-38:16).  He further testified that from 2008-2011 he was probably at the Indigo Room 20 times for "inspections."  Id. at 39:19-40:8.  He testified that every nightclub or bar in Downtown Fort Myers has been subject to administrative searches.  Id. at 61:14-16.

and monitor the Indigo Room into 2012.  As explained above, Aulen was cited four times on January 12, 2012 based on four individuals under 21 being present in the Indigo Room on January 7, 2012.  (Doc. #86-16) (E-Mail from Lt. Jay Rodriguez) (documenting the citations on January 12, 2012).  The inspection on January 7, 2012, occurred after the Police Department received information about underage drinking and the possibility of the use of fraudulent identification at the Indigo Room.  Id.  Aulen subsequently received only two more citations in 2012 – April 26, 2012 and December 1, 2012.  The citation dated December 1, 2012 was given as part of random business checks that the Police Department did at seven different businesses that night.  (Doc. #86-10, ¶16).  Blush Nightclub was also cited for violating the Ordinance during those random checks.  Id. Aulen did not receive any citations for violating the Ordinance in 2013.

The Police Department conducts operations and inspections of commercial establishments, such as the Indigo Room, based on several factors.  Such operations and inspections are conducted in response to specific complaints, on a rotating basis, on a random basis, on a proactive basis, and as necessary to ensure compliance with the City's Code of Ordinances.  (Doc. #86-13) (Response 10 to First Set of Interrogatories). The frequency of such operations and inspections depends on staffing and the overall means of the City to conduct such operations and inspections.  Id.  If the Police Department finds violations at a particular establishment during an operation or inspection, it is more likely that the Police Department will return to that establishment to ensure future compliance.  (Doc. #86-10, ¶5).[12]

---

[12] In addition, Chief Baker acknowledged that businesses with a history of past infractions or violations would be given more attention in future inspections.  (Doc. #86-5, 61:19-62:10).  Officer Gagnon also testified that establishments that are found to be in violation of city ordinances are visited more often and kept an eye on more.  (Doc. #86-4, 61:24-62:2).

Chief Baker became the Chief of Police on January 1, 2009, and has been with the Police Department for 27 years.   (Doc. #86-5 (Baker Depo. 8:18-20; 12:8-15)).   Chief Baker was not personally involved with any of the Police Department activity related to the Indigo Room described above and there is no evidence he directed that the searches be done or citations issued and he was not present when they were.   The record does include a memorandum dated September 29, 2011, sent by Chief Baker to the City Manager re: Indigo Room Update, where he explained on September 28, 2011, Aulen was issued five citations for violating the underage drinking ordinance.   (Doc. #96-5). Another inter-office memorandum dated January 3, 2012, was sent to Chief Baker to inform him of the results of the municipal court proceeding against Aulen when he was found guilty of violating the Ordinance.   (sic) (Doc. #96-6).   Also submitted was an email from Jim Mulligan to Fort Myers police officers, which Plaintiffs argue is a direct command from Chief Baker to officers, which states: "per the Chief if you encounter any more issues with Ray or the other clubs.   Write a citation for EACH underage person.   Not just a few of them."   (Doc. #96-7).   Chief Baker testified that he does not have personal knowledge regarding the number of searches and inspections conducted at the Indigo Room or the number of citations issued to Aulen by the Police Department from the summer of 2008 through to the present.   (Doc. #86-5, 52:5-12; 53:2-14; 81:11-24; 82:5-19).   Chief Baker does not make the determination of what places or locations the Police Department inspects.   Id. at 37:25-38:7; 59:21-24.   That determination is made by the individual who is responsible for the operation, whether it be a lieutenant or a captain.   Id. at 38:8-12. Similarly, Chief Baker is not responsible for scheduling "sting" operations related to the sale of alcohol to minors.   Id. at 48:22-49:1. That responsibility lies with the individual who

is scheduling the "sting" operation.  Id. at 49:2-9.  Chief Baker's only involvement with the process of conducting inspections at alcoholic beverage establishments is the direction that all such inspections must be done on a city-wide basis and not limited to only one geographical area in the City.  Id. at 59:25-60:22.  Chief Baker testified that he has not personally engaged in the targeting of Aulen based on Aulen's political activity and has no knowledge of anyone else in the Police Department having done so.  Id. at 85:19-86:1.

With respect to Dylan Jones, apart from this lawsuit, Chief Baker does not know who Jones is and played no role whatsoever in Jones being cited for violating the Underage Persons Ordinance on November 17, 2011.  (Doc. #86-9 (Baker Aff. ¶¶3, 4)).  Chief Baker was not personally engaged in the targeting of Jones based on Jones' political activity and has no knowledge of anyone else in the Police Department having done so.  Id. ¶5.  Chief Baker was not aware that a petition drive was going to occur at the Indigo Room on November 17, 2011.  (Doc. #86-3 at p. 7) (Response 23 to Request for Admission); (Doc. #86-5, 69:1-6).

## DISCUSSION

### A. *Counts 5 through 7*

Defendants City of Fort Myers and Chief Baker move for summary judgment with respect to Count 5 through 7, which assert Section 1983 actions alleging First Amendment retaliation against the City (Count 5) and Chief Baker in his individual capacity (Count 6) and Fourth Amendment unlawful search (Count 7) against Chief Baker in his individual capacity.  The Court will address each Defendants' arguments in turn.

### 1. City of Fort Myers (Count 5)

With regard to Plaintiff Aulen, Defendant City of Fort Myers argues that the City does not have a policy or custom of retaliating against Aulen, he has not been deprived of a constitutional right, and the required causal connection is lacking.  Plaintiffs respond, arguing that the actions of Officer Gagnon, in performing 88 admitted searches and inspections of the Indigo Room from September 2011 to the present, without justification, constituted egregious violations of the First and Fourth Amendments.  Plaintiffs believe that officers have been provided "unbridled discretion" to conduct administrative searches and inspections by the City.

In Monell v. New York City Dep't of Soc. Servs., the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies.  436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  Municipal liability is limited "to acts that are, properly speaking, acts of the municipality – that is, acts which the municipality has officially sanctioned or ordered."  Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986) (quotation marks omitted).  To establish municipal liability the Plaintiffs must show that: (1) their constitutional rights were violated; (2) the municipality had a custom or policy that constituted deliberate indifference to their constitutional rights; and (3) the policy or custom caused the violation of their constitutional rights.  McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).  The Plaintiffs can establish the requisite "official policy" in one of two ways: (1) identifying an officially promulgated policy, or (2) identifying an unofficial custom or practice, usually shown through the repeated acts of the final policymaker of the entity.  Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329-30 (11th Cir. 2003).  Under either avenue, the Plaintiffs:

(1) must show that the City has authority and responsibility over the governmental function at issue, and (2) must identify those officials who speak with final policymaking authority for the City concerning the act alleged to have caused the particular violation at issue.  Id. at 1330 (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 737, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)).  The policy or custom must be the "moving force" of the constitutional violation.  Id. (citing Monell, 436 U.S. at 694).

Officer Gagnon testified that he believes he conducted an administrative search of the Indigo Room approximately a dozen times between 2008 and 2011.  (Doc. #86-4, 20:16-21).  And from September 2011 to the time of his deposition in 2013, he had probably conducted ten administrative searches of the Indigo Room to detect the possible violation of the City's underage person's ordinance.  Id. at 40:9-14.  In total, Officer Gagnon estimated that he has been to the Indigo Room on official business "probably a hundred times" from 2002 to the present.[13] (Doc. #86-4, 37:20-38:16).  He further testified that from 2008-2011 he was probably at the Indigo Room 20 times for "inspections."  Id. at 39:19-40:8.  He also noted that every nightclub or bar in Downtown Fort Myers has been subject to administrative searches.  Id. at 61:14-16.  Officer Gagnon did not testify that he administratively searched or inspected the Indigo Room 88 times before September 2011, as Plaintiffs have alleged.  Rather, he was asked how many times he has been to the Indigo Room on official business.

Plaintiffs have submitted a chart they created titled "FMPD Visits to Nightclubs January 2011 through February 2013" (Doc. #81-2), allegedly showing that the Indigo

---

[13] Officer Gagnon testified that he was not assigned to bike patrol until 2008, so the approximate 100 visits was really since 2008, as prior to this time he "barely went" to the Indigo Room.  (Doc. #86-4, 37:24-38:12).

Room has been chosen for planned inspections by Fort Myers police officers at least three times as often as any other alcohol-serving establishment in Downtown Fort Myers and more than ten times as often as many establishments.  Plaintiffs have also submitted the data used to compile the chart (Doc. #96-2), which Plaintiffs indicate were code enforcement cases obtained from the City of Fort Myers' Permit/Case Inquiry at https://eservices.cityftmyers.com/iviewpermitinquiry/(S(n4ilbv45iozb4s45femsif45))/defa ult.aspx.  See Doc. #96, p. 3, n.1.  The data allegedly includes *visits* by both Fort Myers Police Department and Code Enforcement, beginning in September 2011, the month in which Aulen admits that he advertised two or three Get out the Vote "18 and Up" nights at the Indigo Room.  (Doc. #86-2, at 50:21-23).   These numbers do not represent administrative searches, they represent number of "visits."  The data shows five visits each during this period of time by Code Enforcement to the Indigo Room, Celsius Nightclub, and Level.  (Doc. #96-1).  Therefore, Indigo Room was subject to the same number of visits by Code Enforcement as other establishments.  As to the number of visits by the Fort Myers Police Department, it is not clear the basis for or even where this information comes from.[14]   The website listed by Plaintiffs as the source for the information is a code enforcement inquiry but Captain Dennis Eads with the Fort Myers Police Department submitted an affidavit in this case that the City does not maintain records that would reflect all inspections conducted by the Police Department at establishments in the City.  (Doc. #86-10, ¶8).  Thus, the data submitted by Plaintiffs does

---

[14] It is not entirely clear that this data and chart would be admissible under Fed. R. Civ. P. 403, 803(6), or 901.  The Court may only consider evidence that "is admissible or that could be presented in an admissible form."  Denney v. City of Albany, 247 F.3d 1172, 1190 n.10 (11th Cir. 2001).  In order for evidence to be admissible the Court must find that the evidence is properly authenticated.  Fed. R. Evid. 901(a).  Even if admissible, the evidence does not persuade the Court that summary judgment is inappropriate.

not support an inference that the City has an official policy that constituted deliberate indifference to Plaintiffs' constitutional rights beginning in September 2011, when Aulen alleges he became more politically active.  There is also no evidence of an official or written custom or practice.  In fact, this correlates to the exact time when Aulen began conducting the "18 and Up" events, which continued into the early part of 2012.  The evidence shows that the Police Department did not begin issuing citations to Aulen for violations of the Ordinance until September 2011 when Aulen made the decision that the Indigo Room qualified for the bona fide restaurant exception and began specifically admitting individuals under 21.  (Doc. #86-2, 45:10-15).  Even then, the Police Department did not begin issuing him citations. Instead, the Police Department brought a copy of the Ordinance to Aulen and warned him that if he continued to allow patrons under 21 to enter the Indigo Room, he would be cited.  Id. at 48:16-49:3; 49:22-50:13.  Aulen ignored this warning, allowed patrons under 21 to enter the Indigo Room, received citations for that conduct, and was found guilty of violating the Ordinance by the Circuit Court of the Twentieth Judicial Circuit, Lee County.  Id. at 49:4-13; 50:14-20; Ex. 12 (Certified Copies of Orders/Commitment Forms).

The evidence further shows that in 2011, the Police Department issued 37 citations for violations of the Ordinance; and six of these citations were issued to Aulen and one was issued to Jones.  Of the six citations issued to Aulen, five of them were issued on September 28, 2011 (a night when the "18 and Up" event was being held) and one was issued on November 17, 2011 (the day Jones signed the petition in the Indigo Room).  (Doc. #86-10, ¶¶11-12).  In fact, based upon Plaintiffs' own "data," the officers did not visit the Indigo Room from April to November 2012.  Thus, in this case, Plaintiffs have failed

to show that the City has the requisite "official policy" that constituted deliberate indifference to their constitutional rights.

Plaintiffs further argue that Chief Baker as the "final policymaker" failed to establish and implement policies and procedures to prevent constitutional deprivations by police officers under his command and therefore "liability may be imposed due to the existence of an improper policy or the absence of a policy."  Citing Rivas v. Freeman, 940 F.2d 1491, 95 (11th Cir. 1991).  Plaintiffs assert that the officers' conduct in this case was facilitated by the failure of the City to enact reasonable legislative or administrative standards for inspections, including the frequency and nature of the inspections.  "Under certain circumstances, a law enforcement agency's failure to adequately train its officers may constitute a 'policy' giving rise to governmental liability."  Id.  "In determining whether a policy or action represents official municipal policy, the court must determine whether the decision at issue was made by 'those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'"  Carter v. City of Melbourne, Fla., 731 F.3d 1161, 1167 (11th Cir. 2013) (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)).

Chief Baker testified that he does not have personal knowledge regarding the number of searches and inspections conducted at the Indigo Room or the number of citations issued to Aulen by the Police Department from the summer of 2008 through to the present.  Id. at 52:5-12; 53:2-14; 81:11-24; 82:5-19. Chief Baker does not make the determination of what places or locations the Police Department inspects. Id. at 37:25-38:7; 59:21-24.  That determination is made by the individual who is responsible for the

operation, whether it be a lieutenant or a captain.  Id. at 38:8-12.  He is though ultimately responsible for the promulgation and implementation of Fort Myers Police Department policies.  Id. at 96:15-20.  Chief Baker's only involvement with the process of conducting inspections at alcoholic beverage establishments in the City is the direction that all such inspections must be done on a city-wide basis and not limited to only one geographical area in the City.[15]  Id. at 59:25-60:22.  Administrative searches or inspections of alcohol serving establishments are under the jurisdiction of the Operations Bureau.  Id. at 39:9-12.  And training regarding administrative searches and inspections is "on-the-job training."  Id. at 44:7-14.  Training regarding First and Fourth Amendment guarantees are also done through the police academy, as well as "in-service training."  Id. at 26:9-22.  Bulletins are also distributed in order to stay current on legal trends.  Id. at 27:12-28:12.

The Court finds that the record does not evidence a failure on the part of law enforcement to adequately train its officers regarding inspections of alcohol-serving establishments.  The record shows that businesses with a history of past infractions or violations would be given more attention in future inspections.  (Doc. #86-5, 61:19-62:10).  Officer Gagnon also testified that establishments that are found to be in violation of city ordinances are visited more often and kept an eye on more.  (Doc. #86-4, 61:24-62:2).  Further, the visits by Code Enforcement and the Fire Department have not shown to be excessive compared to the other alcohol-serving establishments in Downtown Fort Myers.  The operational plans are detailed and direct officers regarding their duties in

---

[15] In addition, Chief Baker acknowledged that businesses with a history of past infractions or violations would be given more attention in future inspections.  (Doc. #86-4, 61:19-62:10).  Officer Gagnon also testified that establishments that are found to be in violation of city ordinances are visited more often and "kept an eye on more."  Id. at 61:24-62:2.

order to address violations of the underage personal ordinance.  (See Doc. #86-10 and exhibits).   Plaintiffs have not shown an unofficial custom or practice, usually shown through the repeated acts of the final policymaker of the entity, which deprived them of their constitutional rights which would raise a genuine issue of material fact regarding Count 5.

### 2.  Chief Baker (Counts 6 & 7)

Chief Baker, sued in his individual capacity, asserts the defense of qualified immunity[16] to Counts 6 and 7, and further argues that there is no evidence that Chief Baker, through his own individual actions, participated in any way in the constitutional violations alleged by the Plaintiffs, or that there is any causal connection between his actions and the alleged violations.  In Count 6, Plaintiffs Aulen and Jones allege a theory of supervisory liability for the arbitrary enforcement and implementation of City ordinances proximately caused the deprivation of the First Amendment rights of the Plaintiffs.   In Count 7, Plaintiffs Aulen and the Indigo Room again allege supervisory liability for Chief Baker's authorization of the illegal and arbitrary administrative searches, violating their Fourth Amendment rights.   Specifically, Plaintiffs argue that Defendant Baker is the final policymaker with respect to police activity in the City of Fort Myers and he knew of the administrative searches occurring in the Indigo Room, and even ordered that they continue.  Even after the filing of this lawsuit in January 2012, which gave Defendant Baker actual notice of the constitutional violations occurring at the behest of Fort Myers Police Department, Plaintiffs assert that Defendant Baker did not take action to stop the

---

[16] "Qualified immunity is an affirmative defense that must be pled, or else it is deemed waived.  Skrtich v. Thornton, 280 F.3d 1295, 1306 (11th Cir. 2002).   Defendants Baker and Gagnon affirmatively alleged qualified immunity in their Answers.  (Doc. #25, p. 11 ¶15; Doc. #27, p. 14 ¶24).

violations.   According to Plaintiffs, the Fort Myers Police Department continued their intrusive and harassing administrative searches into 2013.   (Doc. #96, p. 18).

To establish liability in his individual capacity under Section 1983, the Plaintiffs must show that Chief Baker, acting under color of state law, deprived them of a federal right. Patrick v. Floyd, 201 F.3d 1313, 1315 (11th Cir. 2000).   "It is well established in this [c]ircuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."   Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks omitted).   "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous."   Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003).   "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation."   Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).   A causal connection may be established: (1) when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; (2) when a supervisor's custom or policy results in deliberate indifference to constitutional rights; or (3) when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.   Miller v. King, 384 F.3d 1248, 1261 (11th Cir. 2004) (citing Cottone, 326 F.3d at 1360).

### a.  Count 6 (First Amendment retaliation)

"To state a [First Amendment] retaliation claim,… a plaintiff must establish first, that his speech or act was constitutionally protected; second, that the defendant's

retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).  With respect to Plaintiffs Aulen and Jones, they allege that Chief Baker personally participated in retaliating against them for exercising their First Amendment rights by the use of City ordinances to conduct administrative searches and issue citations harass and intimidate Plaintiffs for their complaints against Fort Myers Police Department and City of Fort Myers officials, citing to three documents in support.  See Docs. #96-5–96-7.  Chief Baker's testimony shows though that he did not personally participate in any visit to the Indigo Room and does not have personal knowledge regarding the number of searches and inspections conducted at the Indigo Room or the number of citations issued to Aulen by the Police Department from the summer of 2008 through to the present.  (Doc. #86-5, 52:5-12; 53:2-14; 81:11-24; 82:5-19).  Chief Baker does not make the determination of what places or locations the Police Department inspects.  Id. at 37:25-38:7; 59:21-24.  That determination is made by the individual who is responsible for the operation, whether it be a lieutenant or a captain. Id. at 38:8-12.  Chief Baker's only involvement with the process of conducting inspections at alcoholic beverage establishments in the City is the direction that all such inspections must be done on a city-wide basis and not limited to only one geographical area in the City.[17]  Id. at 59:25-60:22.  Chief Baker testified that he has not personally engaged in the targeting of Aulen based on Aulen's political activity and has no knowledge

---

[17] In addition, Chief Baker acknowledged that businesses with a history of past infractions or violations would be given more attention in future inspections. (Doc. #86-4, 61:19-62:10).  Officer Gagnon also testified that establishments that are found to be in violation of city ordinances are visited more often and "kept an eye on more."  (Id. at 61:24-62:2).

of anyone else in the Police Department having done so.  Id. at 85:19-86:1.  Chief Baker did not directly or through a subordinate instruct Police Department officers or agents to conduct administrative searches, surveillance or undercover operations at the Indigo Room in the fall of 2011 or 2012 after Plaintiffs say they became more politically active. Nor did Chief Baker personally approve any administrative searches conducted by Police Department officers at the Indigo Room, commencing in September 2011.

In support of Plaintiffs' contention that there is a genuine issue of material fact as to whether Chief Baker was personally involved with and approved the ongoing searches of the Indigo Room in retaliation for their political speech, Plaintiffs submitted a memorandum dated September 29, 2011, sent by Chief Baker to the City Manager re: Indigo Room Update, where he explained that on September 28, 2011, Aulen was issued five citations for violating the underage drinking ordinance.  (Doc. #96-5).  Another inter-office memorandum dated January 3, 2012, was sent to Chief Baker from Lieutenant Jay Rodriguez to inform him of the results of the municipal court proceeding against Aulen when he was found guilty of violating the Ordinance.  (Doc. #96-6).  Also submitted was an email from Jim Mulligan to Fort Myers police officers, which Plaintiffs argue is a direct command from Chief Baker to officers, which states: "per the Chief if you encounter any more issues with Ray or the other clubs.  Write a citation for EACH underage person.  Not just a few of them."  (sic) (Doc. #96-7).   Further, Plaintiff Aulen testified that he has continued his political activity since the fall of 2011, but is limited as to who he can have political activity with and where because he cannot hold events while serving alcohol at the Indigo Room.  (Doc. #86-2, 127:22-128:8).

The Court finds that Plaintiff Aulen has failed to point to evidence that would create a genuine issue of material fact as to whether Chief Baker personally participated in the alleged First Amendment violations.  The September 2011 memorandum does not show Chief Baker instructing subordinates to inspect the Indigo Room or approving of planned operations at the Indigo Room either before or after they occurred.  It is a factual summary of what occurred by Chief Baker to the City Manager.  Further, Exhibit 6 does not show Chief Baker instructing subordinates to inspect the Indigo Room or approving of operations at the Indigo Room either before or after they occurred.  It is a summary to Chief Baker from one of his lieutenants dated January 3, 2012, that summarizes the results of two court cases in which City Police Officers testified.  Finally, the email submitted as Exhibit 7 is the Chief instructing his officers that if they encounter any issues related to the Underage Persons Ordinance at the Indigo Room **or any other establishment** that they should write a citation for each underage person and not just a few of them.  This document supports the testimony of Chief Baker that it was his direction that all such inspections must be done on a city-wide basis and not limited to only one geographical area in the City.  Id. at 59:25-60:22.  There was no further testimony offered regarding these documents.

Even if personal participation is not shown, Plaintiffs may also prove supervisory liability by establishing that there is a causal connection between the actions of Chief Baker and the alleged constitutional deprivations.   "A causal connection can be established by, *inter alia*, 'facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."  Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir.

2010) (citing Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003)).  It appears that Plaintiffs are arguing in this regard that the facts support an inference that Chief Baker employed a custom or policy of allowing subordinates unfettered discretion to conduct numerous visits of the Indigo Room after Aulen's political activity caused "Police Department's hostility toward the referendum to merge the FMPD with the Lee County Sheriff's Office."  (Doc. #96, p. 15).  Chief Baker testified that it was his personal belief that the merger would not improve law enforcement services.  (Doc. #86-5, 66:24-67:2).

     As discussed above, the data submitted by Plaintiffs fails to establish that the City or Chief Baker had an official policy that constituted deliberate indifference to Plaintiffs' constitutional rights beginning in September 2011, when Aulen alleges he became more politically active.  In fact, any increase in visits to the Indigo Room correlates to the exact time when Aulen began conducting the "18 and Up" events, which continued into the early part of 2012, during which time it would be logical for there to be more police presence at the establishment.  There is no evidence to support this was done to suppress speech.  There is no indication in the testimony or evidence that would support an inference that the Chief personally took or knew his officers were taking a particular interest in the Indigo Room beginning in September 2011 in retaliation for Aulen's political speech, nor that Chief Baker directed his subordinates to have contact with the Indigo Room or search it any more than any other alcohol serving establishment in Downtown Fort Myers.  "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  Bennett, 423 F.3d at 1254.  In Bennett, the Eleventh Circuit noted that "[t]he alleged retaliatory acts complained of … include a prolonged and organized campaign of

harassment by local police officers," and that "the record is replete with instances where the defendants followed, pulled over, cited, intimidated, or otherwise harassed the plaintiffs." Id.  The Court finds that the actions in this case do not rise to the same level as was present in Bennett.  In fact, the officers' actions have not deterred Aulen from engaging in political activity and according to Plaintiffs' own "data," the officers did not visit the Indigo Room from April to November 2012.

With respect to Plaintiff Jones, Defendants argue that there is no evidence that Chief Baker, through his own individual actions, participated in any way in the First Amendment violation alleged by Jones or that there is any causal connection between any actions taken by Chief Baker and this alleged violation.  In support, Defendants cite that Jones testified at his deposition that he is not even contending that Chief Baker retaliated against him.  (Doc. #86-1, 42:13-18).  Jones also admitted that he has no information that would suggest that Chief Baker even knew that Jones was issued the citation on November 17, 2011 for violating the Underage Persons Ordinance.  Id. at 42:24-43:3.  As set forth above, Chief Baker testified that he was not aware that a petition drive was going to occur at the Indigo Room on November 17, 2011.  Chief Baker also has confirmed that, apart from this lawsuit, he does not know who Jones is and played no role whatsoever in Jones being cited for violating the Ordinance.  Chief Baker was not personally engaged in the targeting of Jones based on Jones' political activity and has no knowledge of anyone else in the Police Department having done so.  In response, Plaintiffs argue that the City's animus and "extreme hostility" towards the Occupy Fort Myers group is well documented in the federal suit captioned Occupy Fort Myers v. City

of Fort Myers, No. 2:11-cv-608-JES-DNF, the facts of which the Plaintiffs request this Court take judicial notice of.

The Court finds that Jones has failed to point to any evidence of direct involvement by Chief Baker or a causal connection between his conduct and the single citation that he received for violating the Ordinance.  Jones has only made a conclusory allegation that the police department specifically targeted him because of his involvement with the Occupy Fort Myers movement.  Even taking into account the fact that there was a federal lawsuit against the City regarding the movement, this does not satisfy the "extremely rigorous" standard to impose individual supervisory liability over an officer.

### b.  Count 7 (Fourth Amendment Unlawful Search)

Plaintiffs argue that Defendant Gagnon's continued administrative searches of the Indigo Room are unreasonable, and serve as pretext to harass and intimidate Plaintiff Aulen for Plaintiff Aulen's political activity and criticism of the Fort Myers Police Department and city officials.  Plaintiffs assert that there is no record evidence of increased criminal activity at the Indigo Room, or ongoing or excessive violations by Plaintiff Aulen.  Plaintiffs argue that there were at least 88 searches or inspections since September 2011 conducted by Defendant Gagnon which resulted in the writing of ten citations to Plaintiff Aulen as a violation of the "Underage Persons" ordinance, with only five of those successfully prosecuted.  Plaintiffs are arguing in this regard that the facts support an inference that Chief Baker's custom or policy of allowing subordinates unfettered discretion to conduct administrative searches, along with a history of abuse because of the "Police Department's hostility toward the referendum to merge the Fort Myers Police Department with the Lee County Sheriff's Office, which merger effort was

spearheaded by a group chaired by Plaintiff Aulen," resulted in unreasonable administrative searches of the Indigo Room under Chief Baker's watch.  (Doc. #96, p. 15).  Further, Plaintiffs argue that it is constitutionally infirm for Chief Baker to not provide his officers specific training regarding administrative searches and inspections.

In response, Chief Baker argues that there is no evidence that he, through his own individual actions, personally participated in any way in the constitutional violations alleged by Aulen and the Indigo Room or that there is any causal connection between any actions taken by Chief Baker and these alleged violations.  As Chief Baker was not directly involved with any of the Police Department activity related to the Indigo Room. Chief Baker does not make the determination of what places or locations the Police Department inspects. Similarly, Chief Baker is not responsible for scheduling "sting operations" related to the sale of alcohol to minors.  Chief Baker asserts that his only involvement with the process of conducting inspections at alcoholic beverage establishments is the direction that all such inspections must be done on a city-wide basis and not limited to only one geographical area in the City.  But "personal participation … is only one of several ways to establish the requisite causal connection." Swint v. City of Wadley, Ala., 51 F.3d 988, 999 (11th Cir. 1995) (quoting Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991)).  "[L]iability may be imposed due to the existence of an improper policy or from the absence of a policy."  Id.

"[P]rior cases have established that the Fourth Amendment's prohibition against unreasonable searches applies to administrative inspections of private commercial property."  Donovan v. Dewey, 452 U.S. 594, 598, 101 S. Ct. 2534, 2537-38, 69 L. Ed. 2d 262 (1981).  While "legislative schemes authorizing warrantless administrative

searches of commercial property do not necessarily violate the Fourth Amendment," id. at 598, 101 S. Ct. at 2538, pretextual administrative searches do:

> [T]he Fourth Amendment protects the interest of the owner of property in being free from *unreasonable* intrusions onto his property by agents of the government. Inspections of commercial property may be unreasonable if they are not authorized by law or are unnecessary for the furtherance of federal interests. Similarly, warrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials.

Id. at 599, 101 S. Ct. at 2538 (citations omitted) (emphasis in original).  "Thus, where an act authorizing administrative inspections 'fails to tailor the scope and frequency of such administrative inspections to the particular' governmental concern, and 'does not provide any standards to guide inspectors either in their selection of establishments to be searched or in the exercise of their authority to search,' a search warrant will be required." Swint, 51 F.3d at 998 (quoting id.).  "[T]he privacy 'expectation is particularly attenuated in commercial property employed in closely regulated industries,' that have no reasonable expectation of privacy over their products, which historically have been the subject of government oversight."  Crosby, 187 F.3d at 1346 (citing New York v. Burger, 482 U.S. 691, 700, 107 S. Ct. 2636, 2642, 96 L. Ed. 2d 601 (1987)).  "[T]he liquor industry long [has been] subject to close supervision and inspection."  Colonnade Catering Corp. v. United States, 397 U.S. 72, 77, 90 S. Ct. 774, 777, 25 L. Ed. 2d 60 (1970).

Pursuant to the statute which authorizes administrative searches of establishments that hold a license to sell alcoholic beverages, Fla. Stat. § 562.41:

> (1)   Any authorized employee of the division, any sheriff, any deputy sheriff, or any police officer may make searches of persons, places, and conveyances of any kind whatsoever in accordance with the laws of this

state for the purpose of determining whether or not the provisions of the Beverage Law are being violated.

(2)   Any authorized employee of the division, any sheriff, any deputy sheriff, or any police officer may enter in the daytime any building or place where any beverages subject to tax under the Beverage Law or which would be subject to tax thereunder if such beverages were manufactured in or brought into this state in accordance with the regulatory provisions thereof, or any alcoholic beverages, are manufactured, produced, or kept, so far as may be necessary, for the purpose of examining said beverages. When such premises are open at night, such officers may enter them while so open, in the performance of their official duties.

(3)   Any owner of such premises or person having the agency, superintendency, or possession of same, who refuses to admit such officer or to suffer her or him to examine such beverages, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

(4)   Any person who shall forcibly obstruct or hinder the director, any division employee, any sheriff, any deputy sheriff, or any police officer in the execution of any power or authority vested in her or him by law, or who shall forcibly rescue or cause to be rescued any property if the same shall have been seized by such officer, or shall attempt or endeavor to do so, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

(5)   Licensees, by the acceptance of their license, agree that their place of business shall always be subject to be inspected and searched without search warrants by the authorized employees of the division and also by sheriffs, deputy sheriffs, and police officers during business hours or at any other time such premises are occupied by the licensee or other persons."

The section prior to this in the statute reads:

It is deemed by the Legislature that this law is necessary for the more efficient and proper enforcement of the statutes and laws of this state prohibiting the manufacture of, or traffic in, illicit moonshine whiskey and a lawful exercise of the police power of the state for the protection of the public welfare, health, safety, and morals of the people of the state. All the provisions of this law shall be liberally construed for the accomplishment of these purposes.

Fla. Stat. § 562.408.

The record shows that officers searched for violations of the State's liquor laws that must be followed by the Indigo Room.  As discussed above, the record does not bear out Plaintiffs' argument that the Indigo Room was subject to more administrative searches than other Downtown establishments.  Thus, a reasonable officer could have believed that the searches he was conducting were lawful, warrantless administrative searches pursuant to City Ordinance.

In this case, the evidence does not show that there was a policy of the police department under Chief Baker's direction to conduct searches on the Indigo Room that were overly obtrusive, drove away business, or resulted in complaints by patrons.  The record does not show that these searches were conducted at times that were wholly inconvenient to Aulen and his business, such as when the establishment was closed.  In fact, Plaintiff Aulen acknowledged in his depositions that the officers had a right to be there to conduct the searches under the law.[18]  (Doc. #86-2, 176:22-177:20).  The record shows that officers searched for violations of the State's liquor laws that must be followed by the Indigo Room.  As discussed above, the record does not bear out Plaintiffs' argument that the Indigo Room was subject to more administrative searches than other Downtown establishments.  Thus, summary judgment is granted as to this Count.

## B. Qualified Immunity (Chief Baker & Officer Gagnon)

Even if the Plaintiffs could establish a valid claim through a direct or causal connection between the actions of the City and Chief Baker and the alleged constitutional

---

[18] Pursuant to Florida law, "[l]icensees, by the acceptance of their license, agree that their place of business shall always be subject to be inspected and searched without search warrants by the authorized employees of the division and also by sheriffs, deputy sheriffs, and police officers during business hours or at any other time such premises are occupied by the licensee or other persons."  Fla. Stat. § 562.41(5).

violations, Defendants Chief Baker and Officer Gagnon also argue that they are entitled to qualified immunity as to Counts 6 through 10.[19]  The Court agrees.  "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).  "Under the well-defined qualified immunity framework, a 'public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"  Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012) (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)).  "To establish that the challenged actions were within the scope of his discretionary authority, a defendant must show that those actions were: (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority."  Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998) (citing Lenz v. Winburn, 51 F.3d 1540, 1545 (11th Cir. 1995)).

The Court finds that it is apparent from the allegations in Plaintiffs' Complaint, as well as from the record in this case, that Defendants were acting within the scope of their discretionary authority at the time of the incidents.  It would clearly be within the Chief of Police's job description to authorize and enact practices to enforce City ordinances and to order investigations to ensure compliance with City ordinances, including the underage

---

[19] See Pace v. Capoblanco, 283 F.3d 1275, 1282 (11th Cir. 2002) (noting that "[i]n the alternative, the individual defendants are due immunity") (citing Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 2158, 150 L. Ed. 2d 272 (2001) (qualified immunity can protect an officer who behaved unreasonably in violation of the Fourth Amendment); Marsh v. Butler County, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc) (immunity is different from no liability on the merits)).

drinking ordinance, which authorizes his department to issue citations and administratively search the premises. See Harbert, 157 F.3d at 1283.

Once the public official has shown that he was performing a discretionary function, the burden shifts to the plaintiff to show the following two-pronged inquiry: (1) whether the facts that a plaintiff has shown make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 173 L. Ed. 2d 595 (2009). "The Supreme Court recently has made it clear that we need not employ a rigid two-step procedure, but rather may exercise our discretion to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" Gilmore v. Hodges, --- F.3d ---, 2013 WL 5598070, at *5 (11th Cir. Dec. 20, 2013) (citing Pearson, 555 U.S. at 236, 129 S. Ct. 808). For a constitutional right to be clearly established, it "must be sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987).

The qualified immunity defense "embodies an 'objective reasonableness' standard, giving a government agent the benefit of the doubt," provided that the conduct was not "so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed" the acts. GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1366 (11th Cir. 1998). "[S]tate officials can act lawfully even when motivated by a dislike or hostility" if the record shows that they would have acted in the same way without such sentiments. Foy v. Holston, 94 F.3d 1528, 1534 (11th Cir. 1996).

First, the constitutional injuries complained of by Plaintiffs in this case are retaliation for First Amendment activity and unreasonable searches under the Fourth Amendment.  It is clear that the rights at issue in this case were clearly established at the time of the alleged misconduct regarding the First and Fourth Amendment.  "This Court and the Supreme Court have long held that state officials may not retaliate against private citizens because of the exercise of their First Amendment rights." Bennett v. Hendrix, 423 F.3d 1247, 1255 (11th Cir. 2005).  With regard to the Fourth Amendment, under the law, "unreasonable" searches are prohibited.  Second, the Court looks to whether the facts that Plaintiff has shown make out a violation of a constitutional right.

As discussed above, the Plaintiffs have failed to show a violation of their constitutional rights pursuant to the facts of this case.  Therefore, qualified immunity is appropriate for the officers in this case.

**C. Defendant Gagnon's request for attorney's fees and costs**

Defendant Gagnon has moved for an award of attorney's fees arguing that pursuant to 42 U.S.C. § 1988(b), the district court is authorized to award attorney's fees to a defendant upon a finding that a plaintiff's action was frivolous, unreasonable, or without foundation.  As grounds, Defendant cites the Eleventh Circuit's opinion in this matter regarding the motion for preliminary injunction, as well as arguing that Defendant Gagnon was clearly entitled to qualified immunity for his actions.

Section 1988(b) permits a court to award attorney's fees to the "prevailing party" for actions brought "to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964 [42 U.S.C. § 2000d et seq.]"  See generally U.S. Steel, LLC, v. Tieco, Inc., 261 F.3d 1275,

1294 (11th Cir. 2001); Zaklama v. Mount Sinai Med. Ctr., 906 F.2d 645, 648 n.2 (11th Cir.

1990). Ordinarily, a prevailing plaintiff "is to be awarded attorney's fees in all but special

circumstances." Christiansburg Garment Co. v. E.E.O.C., 434 U.S. 412, 417, 421, 98 S.

Ct. 694, 54 L. Ed. 2d 648 (1978).

By contrast, a more stringent standard applies to prevailing defendants, who may

be awarded attorney's fees only when a court finds that the plaintiff's claim was "frivolous,

unreasonable, or without foundation, even though not brought in subjective bad faith." Id.

at 421, 434 U.S. 412, 98 S. Ct. 694, 54 L. Ed. 2d 648. A plaintiff may be assessed fees

if he continues to litigate a once colorable claim after it becomes obvious that the claim is

frivolous, unreasonable, or groundless. Christiansburg, 434 U.S. at 422, 98 S. Ct. 694,

54 L. Ed. 2d 648. In determining whether to assess attorney's fees, the district court must

examine: (1) whether the plaintiff established a prima facie case, (2) whether the

defendant offered to settle, and (3) whether the trial court dismissed the case prior to trial

or held a full-blown trial on the merits. Sullivan v. School Bd. of Pinellas County, 773 F.2d

1182, 1189 (11th Cir. 1985); Turner v. Sungard Bus. Sys., Inc., 91 F.3d 1418, 1422 (11th

Cir. 1996).

In this case, Officer Gagnon is the prevailing party on summary judgment but the

Court finds that the circumstances of this case do not warrant an award of attorney's fees

and costs as the Plaintiffs' claim is not lacking in arguable merit. First, the Eleventh

Circuit's opinion in this case in which it stated that "appellant's First Amendment rights

have not been infringed by the Ordinance," was in the context of Counts One through

Four, which were facial constitutional arguments made regarding the Ordinance at issue

for vagueness and prior restraint on speech. See Indigo Room, 710 F.3d 1294. The

constitutional challenges brought in Counts Five through Ten were as applied challenges in which Plaintiffs challenged and alleged that the Defendants' policies, practices, and individual actions of the Defendants were unconstitutional, coming forward with arguments and evidence for why summary judgment was not appropriate.   While the Court did not ultimately side with the Plaintiffs on this issue, it does not mean that prior to summary judgment it had become apparent to the Plaintiffs that their constitutional challenges were groundless.  From the Court's review of the pleadings and the record, the Court finds that this was not the case. Further, with regard to qualified immunity, as discussed above the Court examined whether the facts that Plaintiffs presented made out a violation of a constitutional right.  This was a fact-specific inquiry for which Plaintiffs made a colorable claim that was not groundless.

Accordingly, it is now

**ORDERED:**

(1) Defendant, Fort Myers Police Officer Alain Gagnon's Amended Rule 56 Dispositive Verified Motion for Summary Judgment (Doc. #70) is **GRANTED**.

(2) Plaintiffs Motion for partial summary judgment against Defendant Gagnon as to Count 10 (Doc. #87) is **DENIED**.

(3) Defendants City of Fort Myers and Chief Douglas Baker's Amended Motion for Summary Judgment as to Counts Five Through Seven (Doc. #86) is **GRANTED**.

(4) Defendant, Fort Myers Police Officer Alain Gagnon's Amended Motion for Attorney's Fees and Costs (Doc. #71) in **DENIED**.

(5) The Clerk is directed to enter judgment accordingly, terminate all deadlines,

and **CLOSE** the file.

**DONE** and **ORDERED** in Fort Myers, Florida this 29th day of January, 2014.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE


Copies:  All Parties of Record